## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHAEL BANERIAN; PETER
COLOVOS; WILLIAM GORDON; JOSEPH
GRAVES; BEAU LaFAVE; CAMERON
PICKFORD; and HARRY SAWICKI,

                           Plaintiffs

        v.

JOCELYN BENSON, in her official capacity
as the Secretary of State of Michigan;

DOUGLAS CLARK, in his official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

JUANITA CURRY, in her official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

ANTHONY EID, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

RHONDA LANGE, in her official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

STEVEN TERRY LETT, in his official
capacity as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

BRITTNI KELLOM, in her official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

**Case No. _____**

**Three-Judge Panel Requested**
**28 U.S.C. § 2284(a)**

CYNTHIA ORTON, in her official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

M.C. ROTHHORN, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

REBECCA SZETELA, in her official
capacity as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

JANICE VALLETTE, in her official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

ERIN WAGNER, in her official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

RICHARD WEISS, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

DUSTIN WITJES, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission.

                                Defendants.

**COMPLAINT**

## INTRODUCTION

1.      Plaintiffs Michael Banerian, Peter Colovos, William Gordon, Joseph Graves, Beau LaFave, Cameron Pickford, and Harry Sawicki bring this suit to challenge Michigan's recently enacted congressional districts as violative of the United States Constitution.

2.      As an initial matter, Michigan's adopted congressional districts violate the "one person, one vote" rule enshrined in Article I, Section 2 of the U.S. Constitution.

3.      This principle requires that "[r]epresentatives be chosen 'by the People of the several States'" in a way that ensures that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964) (quoting U.S. Const. art. I, § 2).

4.      Because Michigan's newly adopted congressional districts fall far below this standard, they are unconstitutional and cannot stand.

5.      Michigan's adopted congressional districts, moreover, violate the Fourteenth Amendment of the U.S. Constitution.

6.      The individuals serving on the Michigan Independent Citizens Redistricting Commission (the "Commissioners") failed to draw Michigan's congressional maps in accordance with neutral, and traditionally accepted, redistricting criteria (now codified at Article IV, Section 6(13) of the Michigan Constitution).

7.      The Commissioners' failure in this respect amounts to arbitrary boundary drawing, in violation of the Fourteenth Amendment's equal-protection guarantee.

8.      Among other pressing defects, the Commissioners' congressional map unnecessarily fragments counties, townships, and municipalities—*i.e.*, Michigan's true communities of interest—without any legitimate or rational State interest.

1

9.     To be certain, compliance with federal law (as informed by the Michigan Constitution) is neither impossible nor particularly onerous.

10.     Indeed, as demonstrated by the remedy map attached to this filing as Exhibit A, the Commissioners had ample ability to draw and adopt congressional districts without the aforementioned flaws.

11.     The Commissioners' failure to do so warrants the declaratory and injunctive relief sought by Plaintiffs in this action.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, and 28 U.S.C. § 1343 because Plaintiffs' claims all arise under—and seek redress pursuant to—the U.S. Constitution and 42 U.S.C. § 1983.

13.     Under 28 U.S.C. § 2284, a three-judge panel should hear and determine this case.

14.     Under 28 U.S.C. § 1391(b), venue is proper in this District because one of the Defendants, Secretary of State Jocelyn Benson, resides in this District.

## THREE-JUDGE COURT REQUESTED

15.     In this action, Plaintiffs challenge the constitutionality of the Commissioners' reapportionment of Michigan's congressional districts.

16.     28 U.S.C. § 2284(a) provides that "[a] district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."

17.     For this reason, Plaintiffs respectfully request that the Court "immediately notify the chief judge of the circuit" so that the Chief Judge may "designate two other judges, at least one

2

of whom shall be a circuit judge," to "serve as members of the court to hear and determine th[is] action." 28 U.S.C. § 2284(b)(1).

## PARTIES

18. Each Plaintiff is a natural person, a citizen of the United States, and is registered to vote in Michigan.

19. Plaintiff Michael Banerian lives in Royal Oak, Michigan, which is in Oakland County. Mr. Banerian regularly votes in federal, state, and local elections in Michigan. Under the enacted map, Mr. Banerian resides in the newly created 11th Congressional District.

20. Plaintiff Peter Colovos lives in Benton Harbor, Michigan, which is in Berrien County. Mr. Colovos regularly votes in federal, state, and local elections in Michigan. Under the enacted map, Mr. Colovos resides in the newly created 4th Congressional District.

21. Plaintiff William Gordon lives in Scio Township, Michigan, which is in Washtenaw County. Mr. Gordon regularly votes in federal, state, and local elections in Michigan. Under the enacted map, Mr. Gordon resides in the newly created 6th Congressional District.

22. Plaintiff Joseph Graves lives in Linden, Michigan, which is in Genesee County. Mr. Graves regularly votes in federal, state, and local elections in Michigan. Under the enacted map, Mr. Graves resides in the newly created 8th Congressional District.

23. Plaintiff Beau LaFave lives in Iron Mountain, Michigan, which is in Dickinson County. Mr. LaFave regularly votes in federal, state, and local elections in Michigan. Under the enacted map, Mr. LaFave resides in the newly created 1st Congressional District.

24. Plaintiff Cameron Pickford lives in Charlotte, Michigan, which is in Eaton County. Mr. Pickford regularly votes in federal state, and local elections in Michigan. Under the enacted map, Mr. Pickford resides in the newly created 7th Congressional District.

25.     Plaintiff Harry Sawicki lives in Dearborn Heights, Michigan, which is in Wayne County. Mr. Sawicki regularly votes in federal, state, and local elections in Michigan. Under the enacted map, Mr. Sawicki resides in the newly created 12th Congressional District.

26.     Defendant Jocelyn Benson is the Michigan Secretary of State. In this capacity, Ms. Benson must enforce the district boundaries for congressional districts and accept the declarations of candidacy for congressional candidates. Plaintiffs sue Ms. Benson solely in her official capacity.

27.     Non-party Michigan Independent Citizens Redistricting Commission ("the Commission") is an entity created by the Michigan Constitution to, every ten years, "adopt a redistricting plan for each of the following types of districts: state senate districts, state house of representative districts, and congressional districts." Mich. Const. art. IV, § 6(1).

28.     The Commission is composed of thirteen members: four affiliated with the Democratic Party, four affiliated with the Republican Party, and five unaffiliated with either major political party. *Id.*

29.     Defendant Douglas Clark serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Mr. Clark is affiliated with the Republican Party. Plaintiffs sue Mr. Clark solely in his official capacity.

30.     Defendant Juanita Curry serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Curry is affiliated with the Democratic Party. Plaintiffs sue Ms. Curry solely in her official capacity.

31.     Defendant Anthony Eid serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Mr. Eid is not affiliated with either major political party. Plaintiffs sue Mr. Eid solely in his official capacity.

32.     Defendant Rhonda Lange serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Lange is affiliated with the Republican Party. Plaintiffs sue Ms. Lange solely in her official capacity.

33.     Defendant Steven Terry Lett serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Mr. Lett is not affiliated with either major political party. Plaintiffs sue Mr. Lett solely in his official capacity.

34.     Defendant Brittni Kellom serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Kellom is affiliated with the Democratic Party. Plaintiffs sue Ms. Kellom solely in her official capacity.

35.     Defendant Cynthia Orton serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Orton is affiliated with the Republican Party. Plaintiffs sue Ms. Orton solely in her official capacity.

36.     Defendant M.C. Rothhorn serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Mr. Rothhorn is affiliated with the Democratic Party. Plaintiffs sue Mr. Rothhorn solely in his official capacity.

37.     Defendant Rebecca Szetela serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Szetela is not affiliated with either major political party. Plaintiffs sue Ms. Szetela solely in her official capacity.

38.     Defendant Janice Vallette serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Vallette is not affiliated with either major political party. Plaintiffs sue Ms. Vallette solely in her official capacity.

39.    Defendant Erin Wagner serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Ms. Wagner is affiliated with the Republican Party. Plaintiffs sue Ms. Wagner solely in her official capacity.

40.    Defendant Richard Weiss serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Mr. Weiss is not affiliated with either major political party. Plaintiffs sue Mr. Weiss solely in his official capacity.

41.    Defendant Dustin Witjes serves as a commissioner on the Michigan Independent Citizens Redistricting Commission. Mr. Witjes is affiliated with the Democratic Party. Plaintiffs sue Mr. Witjes solely in his official capacity.

## GENERAL ALLEGATIONS

42.    In November 2018, Michigan amended its Constitution to establish the Michigan Independent Citizens Redistricting Commission, ("the Commission") a citizen-comprised entity vested with the exclusive authority to adopt district boundaries for State and congressional elections after each decennial census. *See* Mich. Const. art. IV, § 6(1).

43.    The 2018 amendment also prescribed the criteria the Commissioners must apply when adopting each district plan.

44.    Specifically, Article IV, Section 6(13) of the Michigan Constitution provides that the Commissioners must abide "by the following criteria in proposing and adopting each plan, in order of priority":

6

A.      Districts shall be of equal population as mandated by the United States Constitution, and shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.

B.      Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.

C.      Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.

D.      Districts shall not favor or disfavor an incumbent elected official or a candidate.

E.      Districts shall reflect consideration of county, city, and township boundaries.

F.      Districts shall be reasonably compact.

45.     The criteria enumerated in the Michigan Constitution track the traditional (and traditionally accepted) redistricting criteria used in several jurisdictions across the Nation.

46.     The Supreme Court recognizes these traditional redistricting criteria. *See, e.g., Karcher v. Daggett*, 462 U.S. 725, 740 (1983).

47.     These traditional redistricting criteria serve as a means to prevent unconstitutional gerrymandering and ensure compliance with federal law. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (imposing a compactness requirement to determine whether § 2 of the Voting Rights Act requires the drawing of a majority-minority district).[1]

---

[1] *See also Bush v. Vera*, 517 U.S. 952, 979 (1996) ("If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district."); *id*. at 962 (stating that in proving a racial gerrymandering claim under the Fourteenth Amendment's Equal Protection Clause, "[t]he Constitution does not mandate regularity of district shape . . . and the neglect of traditional

48.     In mid-September 2020, the Commissioners met for the first time to begin drawing Michigan's voting districts.

49.     According to the 2020 Decennial Census, Michigan has a population of 10,077,331 persons.

50.     Based on these numbers, Michigan was apportioned thirteen congressional districts.

51.     To ensure that no district suffers from vote dilution in contravention of the "one person, one vote" principle recognized by the U.S. Supreme Court, the Commissioners were obligated to adopt districts that each have a population as close to 775,179 persons as possible.

52.     According to publicly available information, the Commissioners considered five congressional plans, three of which were named after a species of tree ("Apple," "Birch," and "Chestnut") and two of which were named, respectively, after a commissioner ("Lange" and "Szetela").

53.     On December 28, 2021, the Michigan Independent Citizens Redistricting Commission adopted and enacted the "Chestnut Plan," which appears as follows (and is available at https://michigan.mydistricting.com/legdistricting/comments/plan/279/23 (visited Jan. 6, 2022)):

---

districting criteria is merely necessary, not sufficient. For strict scrutiny to apply, traditional districting criteria must be subordinated to race").





54.     The Chestnut Plan's largest congressional district (District 13) has a population of

775,666 persons, which is 487 persons above the ideal population for congressional districts in

Michigan.

55.     The Chestnut Plan's smallest congressional district (District 5) has a population of

774,544 persons, which is 635 persons below the ideal population for congressional districts in

Michigan.

56.     The difference in population between the largest and smallest congressional

districts in the Chestnut Plan is 1,122 persons.

57.     Only one congressional district (District 10) in the Chestnut Plan is less than 50

persons away from the ideal population (+39) for congressional districts in Michigan.

58.     The following chart lists the population deviations for each district.

| DISTRICT | TOTAL PERSONS | DEVIATION |
|---|---|---|
| District One | 775,375 | +196 |
| District Two | 774,997 | -182 |
| District Three | 775,414 | +235 |
| District Four | 774,600 | -579 |
| District Five | 774,544 | -635 |
| District Six | 775,273 | +94 |
| District Seven | 775,238 | +59 |
| District Eight | 775,229 | +50 |
| District Nine | 774,962 | -217 |
| District Ten | 775,218 | +39 |
| District Eleven | 775,568 | +389 |
| District Twelve | 775,247 | +68 |
| District Thirteen | 775,666 | +487 |

59.     The Commissioners' failure to create districts with equal population also suggests that they did not prioritize the criteria enumerated in the Michigan Constitution in the order mandated by the Michigan Constitution. *See* Mich. Const. art. IV, § 6(13).

60.     The remedy map attached to this Complaint (Exhibit A) reduces the difference in population to 1 person (nine districts have a population of 775,179 each and four districts have a population of 775,180 each).

61.     Of Michigan's eighty-three counties, the Chestnut Plan splits at least fifteen of them (approximately 18%).

62.     In fact, parts of Oakland County are located in *six* separate congressional districts.

63.     Not only does this contravene the Michigan constitutional requirement that the State's congressional districts "reflect consideration of county, city, and township boundaries,"

11

Mich. Const. art. IV, § 6(13)(f), it also carves up "communities of interest," as that phrase has been construed by the Michigan Supreme Court and federal courts across the nation.

64.     This is evidence that the Commissioners did not apply its criteria in a neutral and consistent manner but rather in an inconsistent and arbitrary manner.

65.     As such, the boundaries established by the Commissioners are arbitrary, inconsistent, and non-neutral, in contravention of the Fourteenth Amendment's Equal Protection Clause. *See also* Mich. Const. art. IV, § 6(13)(c) (congressional districts must "reflect the state's diverse population and communities of interest").

66.     The remedy map attached to this Complaint (Exhibit A) reduces the number of split counties to ten.

67.     The remedy map attached to this Complaint also ensures that no Michigan county is part of more than four congressional districts.

68.     The remedy map attached to this Complaint has fewer city and township splits than the number of city and township splits in the Chestnut Plan.

69.     The attached remedial map more faithfully adheres to the Michigan's constitution's requirements to respect county, city, and township boundaries.

70.     Finally, the Chestnut Plan cannot be described as "compact" under any reasonable interpretation of that term.

71.     Indeed, the Chestnut Plan's District 5 (which splits four of the ten counties it covers) touches Michigan's Eastern *and* Western border.

72.     Although not dispositive, this lack of compactness is evidence that the Commissioners did not act in a good faith effort to achieve population equality.

73.     As reported by the Commissioners, the average compactness of the Chestnut Plan's districts is .41 on the Polsby-Popper measure, and .42 on the Reock Measure, with the least compact districts having scores of .27 and .19 respectively.

74.     On both measures, numbers closer to one are more compact, and numbers closer to zero are less compact.

75.     The remedy map attached to this Complaint (Exhibit A) greatly increases the compactness of several congressional districts, including District 5.

76.     The proposed remedy map (Exhibit A) yields an average Polsby-Popper measure of .46 and an average Reock measure .45, with the least compact districts being at .3 and .21 respectively.

77.     That the Commissioners failed to abide by the constitutionally imposed traditional redistricting criteria (as reflected by the Michigan constitution) is evidence that the map they adopted inflicts constitutional harms on Plaintiffs. *Bush v. Vera*, 517 U.S. 952, 962–63 (1996).

78.     In short, the remedy map attached to this Complaint (Exhibit A) demonstrates that it was well within the Commissioners' capacity to adopt a congressional map that complied with the "one person, one vote" principle while leaving far more counties intact and greatly increasing the compactness of Michigan's congressional districts (in compliance with the Fourteenth Amendment's Equal Protection Clause).

## COUNT I
### Violation of Article I, Section 2 of the U.S. Constitution
### "One Person, One Vote"
### (42 U.S.C. § 1983)

79. Plaintiffs restate and incorporate by reference each and every allegation in Paragraphs 1 through 78.

80. Article I, Section 2 of the U.S. Constitution mandates that congressional districts must achieve population equality "as nearly as is practicable." *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 18 (1964).

81. According to the 2020 Census, Michigan has a population of 10,077,331 persons.

82. Based on these Census numbers, Michigan was apportioned thirteen Congressional Districts.

83. Therefore, the ideal population in each congressional district is approximately 775,179 persons.

84. The Chestnut Plan substantially deviates from Article I, Section 2's command.

85. Congressional District 13 has the highest population of 775,666 persons (487 above the ideal population) while Congressional District 5 has a population of 774,544 persons (895 below the ideal population).

86. The Chestnut plan has an overall population deviation of 1,122 persons.

87. The total deviation is therefore 0.14%.

88. The existence of congressional district plans with lower population deviations shifts the burden from the plaintiff to the State to justify the need for the deviations.[2]

---

[2] *See, e.g., Larios v. Cox,* 300 F. Supp. 2d 1320, 1354 (N.D. Ga. 2004) (three-judge court) (holding that Georgia did not make a good-faith effort to draw congressional districts of nearly equal population, shifting burden to state to justify its deviations, when Georgia's plan had a total population deviation of seventy-two people and testimony was given demonstrating that a near zero population deviation map was possible) *aff. mem.*, 542 U.S. 947 (2004). Sometimes a state

89.     As demonstrated by the remedy map (Exhibit A) the Commissioners could have enacted a map with a population deviation of nearly zero.

90.     The Commissioners did not make a good-faith effort to draw a map with nearly as equal population as possible.

91.     Upon information and belief, the Chestnut Plan's population deviations were not intended to further any legitimate state objective.

92.     Accordingly, the Defendants were and are acting under the color of state law and violating Plaintiffs' constitutional rights, violating 42 U.S.C. § 1983.

## COUNT II
**Violation of Fourteenth Amendment to the United States Constitution**
**Equal Protection**
**(42 U.S.C. § 1983)**

93.     Plaintiffs restate and incorporate by reference each and every allegation in Paragraphs 1 through 92.

94.     The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

95.     Article One, Section Four of the Constitution vests state legislatures with the authority to group voters together in congressional districts.

96.     When a legislature draws districts, traditional redistricting criteria serve as guardrails to ensure compliance with the U.S. Constitution, including the Equal Protection Clause.

---

cannot justify even minimal population deviations. *See, e.g., Vieth v. Pennsylvania*, 195 F. Supp. 2d 672, 674–78 (M.D. Pa. 2002) (three-judge court) (holding that Pennsylvania's congressional district maps violated the one person, one vote requirement where the total population deviation was 19 persons and Pennsylvania could not justify the deviation); *Karcher*, 462 U.S. at 728 (declaring unconstitutional New Jersey's congressional district plan with a maximum deviation of 0.6 percent or 3,674 persons and where plans with smaller population deviations were presented).

97.     For example, making districts compact, respecting communities of interest, ensuring that districts are contiguous, and preventing the pairing of incumbents all serve to limit various forms of gerrymandering and vote dilution.

98.     A Fourteenth Amendment Equal Protection violation arises when a legislature or commission implements traditional redistricting criteria in an inconsistent and arbitrary manner.

99.     Moreover, the Equal Protection Clause prohibits laws that treat people disparately or arbitrarily.

100.    The criteria enumerated in the Michigan Constitution track the traditional (and traditionally accepted) redistricting criteria used throughout the nation, all of which exist to ensure compliance with the U.S. Constitution and federal law.

101.    Because the Commissioners arbitrarily applied Michigan's constitutional requirements, the Commissioners imposed U.S. Constitutional injuries on Michigan's voters.

102.    Specifically, Article IV, Section 6(13) of the Michigan Constitution requires the Commissioners to apply specific criteria "in proposing and adopting each plan, in order of priority."

103.    The Commissioners applied the Michigan constitutional criteria in an inconsistent and arbitrary manner.

104.    The Chestnut Plan fails to comply with or properly apply the following criteria:

    A.    Districts shall be of equal population as mandated by the United States Constitution, Mich. Const. art. IV, § 6(13)(a);

    B.    Districts shall reflect the state's diverse population and communities of interest, *id.* § 6(13)(c);

    C.    Districts shall reflect consideration of county, city, and township boundaries, *id.* § 6(13)(f); and

    D.    Districts shall be reasonably compact, *id.* § 6(13)(g).

105.     Communities of interest requirements, whole county requirements, and whole township requirements ensure that when casting a vote in a congressional district, the voter is selecting a candidate that can represent both the individual's interests and the common interests of the community within the district.

106.     Because federal law, as well as the Michigan Supreme Court, have long construed the phrase "communities of interest" to include counties, cities, and townships, the Chestnut plan's arbitrary county, township, and municipalting splits also violate the requirement that "[d]istricts shall reflect the state's diverse population and communities of interest." Mich. Const. art. IV, § 6(13)(c).

107.     The Commissioners applied the communities of interest criterion in an inconsistent and arbitrary manner.

108.     The communities of interest requirement and the requirement to keep counties and townships whole protects an individual's right to vote and their fundamental First Amendment right to associate with their fellow citizens to advance the interests of the community, township, and county.

109.     The Commissioners arbitrarily assigned voters to various locations.

110.     The Commissioners did not draw a map with as few split counties as possible.

111.     By unnecessarily fragmenting counties—*i.e.*, Michigan's true communities of interest—the Commissioners' adopted map is arbitrary, inconsistent, and non-neutral, violating the Equal Protection Clause.

112.     And by unnecessarily splitting so many counties, cities, and townships the Commissioners appear to have used a wholly novel definition and arbitrarily and inconsistently applied the phrase "communities of interest." Mich. Const. art. IV, § 6(13)(c).

113.    For these reasons, the Commissioners violated the Fourteenth Amendment's Equal Protection Clause because some voters will be able to elect candidates who can represent the interests of both the individual and the community.

114.    Voting is both an expression of an individual's preference for a congressional representative and it is an associational act in choosing a congressional representative to represent and advance the interests of fellow voters in a community.

115.    In these acts, the citizens of Michigan are required to be treated equally, which Defendants' have failed to do.

116.    Thus, when the Commissioners arbitrarily and inconsistently applied their state constitutional requirements of keeping counties and townships whole and maintaining communities of interest, they violated the Equal Protection Clause.

117.    In other words, the Commissioners ignored roughly half the criteria listed in the Michigan Constitution

118.    To the extent the Commissioners (im)properly applied any criteria, they did so out of the order of priority mandated by the Michigan Constitution.

119.    As demonstrated by the remedial map (Exhibit A) the Commissioners were required to comply with each of the aforementioned traditional redistricting criteria.

120.    The Commissioners' failure to do so renders the congressional maps they adopted arbitrary, inconsistent, and non-neutral, in violation of the Fourteenth Amendment's Equal Protection Clause.

121.    At all times the Defendants were and are acting under the color of state law and violating Plaintiffs' constitutional rights, violating 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Convene a three-judge district court to hear and determine Plaintiffs' claims that the Commissioners' Congressional Plan violates the U.S. Constitution;

B.   Declare that the Commissioners' Congressional Plan violates the one person, one vote principle contained in Article I, Section 2 of the U. S. Constitution;

C.   Declare that the Commissioners' Congressional Plan violates the Fourteenth Amendment's Equal Protection Clause;

D.   Enjoin Defendants, their agents, and assigns, from holding any congressional elections using the enacted map, the Chestnut Plan;

E.   Establish a deadline by which the Commissioners must redraw maps, and if the Commissioners do not act by this deadline, assume jurisdiction, appoint a special master, and draw constitutionally compliant congressional districts;

F.   Enjoin Defendants from using any plan for congressional elections that does not comply with the U.S. Constitution;

G.   Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this action, in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

H.   Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

I.   Grant such other and further relief as the Court may deem just and proper.

January 20, 2022

/s/ Charles Spies
Charles Spies (P83260)
Max A. Aidenbaum (P78793)
DICKINSON WRIGHT PLLC
123 Allegan Street
Lansing, Michigan 48933
cspies@dickinsonwright.com
MAidenbaum@dickinsonwright.com
(517) 371-1730 (phone)
(844) 670-6009 (fax)

Respectfully submitted,

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky
Shawn Toomey Sheehy
Edward M. Wenger
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, Virginia 20169
jtorchinsky@holtzmanvogel.com
ssheehy@holtzmanvogel.com
emwenger@holtzmanvogel.com
(540) 341-8808 (phone)
(540) 341-8809 (fax)

*Attorneys for Plaintiffs Michael Banerian, Peter Colovos,
William Gordon, Joseph Graves, Beau LaFave,
Cameron Pickford, and Harry Sawicki.*