UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL BANERIAN, *et al.*, | ) |
|     Plaintiffs, | ) |
| | )   No. 1:22-cv-54 |
| v. | ) |
| | )   Three-Judge Court |
| JOCELYN BENSON, in her official | ) |
| capacity as the Secretary of State | ) |
| of Michigan, *et al.*, | ) |
|     Defendants. | ) |
| | ) |

## OPINION DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

KETHLEDGE, Circuit Judge. Of the five congressional redistricting plans voted on by Michigan's Independent Citizens Redistricting Commission, the plan that the Commission chose—the "Chestnut Plan"—came the closest to perfect compliance with the Supreme Court's "one-person one-vote" rule. Yet here the plaintiffs have moved to enjoin the State's implementation of that plan, arguing that it violates that same rule. We deny the motion.

I.

A.

In November 2018, Michigan voters approved Ballot Proposal 18-2, which amended Michigan's Constitution to change how the lines for Michigan's congressional districts (as well as state legislative districts) are drawn. Specifically, the amendment transferred the power to draw those lines from the State Legislature to a newly created "Independent Citizens Redistricting Commission." Per the amendment's terms, the Commission must comprise thirteen members: four who identify as Democrats, four who identify as Republicans, five who affiliate with neither

1

party, and none of whom have been active in politics during the preceding six years. *See* Mich. Const. art. IV, § 6(1)(b). The amendment also directs the Commission to consider the following districting criteria, listed in order of priority:

> (a) Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.
>
> (b) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.
>
> (c) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.
>
> (d) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.
>
> (e) Districts shall not favor or disfavor an incumbent elected official or a candidate.
>
> (f) Districts shall reflect consideration of county, city, and township boundaries.
>
> (g) Districts shall be reasonably compact.

Mich. Const. art. IV, § 6(13).

The Commission first convened in September 2020, as it awaited results of the 2020 Census. Before attempting to draft any congressional-district lines, the Commission held 16 public hearings; after the Commission began drafting, it held upward of 120 hearings more. *See* Mich. Const. art. IV, § 8. Different commissioners eventually drafted five different districting plans; commissioner Anthony Eid drafted the "Chestnut Plan," which used public comments to identify "communities of interests" in different parts of the State.

In November 2021, the Commission published the Chestnut Plan along with four others (the Apple, Birch, Lange, and Szetela Plans) for a 45-day period of public notice-and-comment.

*See* Mich. Const. art. IV, § 6(14)(b). The Commission received thousands of comments regarding the five plans.

On December 28, 2021, the Commission convened to choose a final plan. Eleven of the thirteen commissioners picked the Chestnut Plan as either their first or second choice. The Commission ultimately adopted the Chestnut plan by an 8-5 vote, with two Democratic, two Republican, and four independent commissioners voting in favor of the Plan.

B.

The plaintiffs brought this suit on January 20, 2022, asserting two claims. Their second claim we recently dismissed as nonjusticiable. *See Banerian v. Benson*, ___ F.Supp.3d ___, 2022 WL 676001 (W.D. Mich. 2022). The plaintiffs' remaining claim is that the Chestnut Plan violates the one-person one-vote rule announced by the Supreme Court in *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964). According to that rule, states must "achieve population equality" among congressional districts "as nearly as is practicable." *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (cleaned up).

Using 2020 Census numbers, the ideal population for each district in Michigan is 775,179 persons. The Chestnut Plan deviates from that ideal by 0.14%—meaning the difference in population between its most populous and least populous districts (namely, 1,122 persons) equals 0.14% of the ideal population. (The four other plans voted on by the Commission had deviations ranging from 0.22% to 0.48%.) The Chestnut Plan's deviation, the plaintiffs claim, violates the Constitution.

On January 27, the plaintiffs filed a motion in which they requested "that the Court preliminarily enjoin the State from using [the Chestnut Plan] for any congressional election in Michigan." Mot. at 36. In support, the plaintiffs submitted a plan of their own creation, which

equalized population among districts while substantially redrawing district lines statewide. On February 4, 2022, the plaintiffs moved to expedite adjudication of their motion, citing a pending April 19 filing deadline for Michigan congressional candidates. We granted that motion in substantial part, set an expedited briefing schedule, and scheduled oral argument for March 16. The next day—February 9—the plaintiffs filed another motion to expedite, asking this court to reschedule oral argument for March 1. We denied that motion. The Defendant Commissioners (hereinafter, "defendants") filed their brief in opposition to the plaintiffs' preliminary-injunction motion on February 18, the date specified in our briefing schedule. Exhibit C to the defendants' brief in opposition was a declaration by Commissioner Eid, which he submitted under penalty of perjury. *See* 28 U.S.C. § 1746.

Eid's declaration describes a redistricting plan animated by a principle of self-determinism: public comments on the various plans, as Eid describes it, drove the Commission to recognize (by its adoption of the Chestnut Plan) particular communities of interest in different parts of the State—which in turn led the Commission to draw the district lines as it did. The plaintiffs, in their reply brief, argued that Eid's declaration had misrepresented the thrust of the relevant public comments.

During the March 16 hearing, this court directed the defendants and plaintiffs alike to provide—no later than March 22—specific citations to the Commission's record for every single public comment that they thought supported or refuted, respectively, Eid's representations in his declaration. In response, the defendants submitted a 787-page appendix, which included copies of 546 comments that, the defendants said, supported Eid's representations. The plaintiffs, for their part, claimed that 199 comments refuted Eid's representations, for which they provided citations (usually by way of "*see, e.g.*" cites) for only 59.

II.

A preliminary injunction is an extraordinary remedy, to which the movant must show a clear entitlement. *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). Four factors govern our decision whether to grant or deny a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (cleaned up). Although "considerations specific to election cases" can affect our assessment of these factors, *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the most important factor is often the movant's likelihood of success on the merits, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (internal quotation marks omitted). We begin with that factor here.

A.

The Supreme Court has held that Article I, § 2 of the Constitution requires "equal representation for equal numbers of people" in congressional districts. *Wesberry*, 376 U.S. at 18. That rule (the "one-person, one-vote" rule) "does not require that congressional districts be drawn with precise mathematical equality" as to population. *Tennant v. Jefferson County Com'n*, 567 U.S. 758, 759 (per curiam). Instead, the Court is "willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts." *Karcher*, 462 U.S. at 740.

The relevant analysis proceeds in two steps. "First, the parties challenging the plan bear the burden of proving the existence of population differences that could practically be avoided." *Tennant*, 567 U.S. at 760. Here, we assume for purposes of argument that the plaintiffs have made

5

that showing. Second, upon that showing, "the burden shifts to the State to 'show with some specificity' that the population differences 'were necessary to achieve some legitimate state objective.'" *Id.* (quoting *Karcher*, 462 U.S. at 741).

The "specificity" the State must provide depends, in turn, on four factors. The Supreme Court has explained: "The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Karcher*, 462 U.S. at 741.

1.

Here, all four factors direct us to review deferentially the Commission's justification for the Chestnut Plan's deviation from perfect equality of population. First, the Chestnut Plan's 0.14% deviation is small. In *Tennant*, the deviation was more than five times bigger—0.79%—and yet the Supreme Court unanimously reversed the district court (which had enjoined the plan there) on the ground that it had "failed to afford appropriate deference" to the State's justifications for its redistricting plan. 567 U.S. at 759.

Second, the interest that the Commission sought to further by means of its district lines—namely, preservation of "communities of interest"—is undisputedly legitimate. Indeed, the plaintiffs agree that the preservation of such communities is a "traditional districting criter[ion]" employed by more than 20 states. Mot. for Prelim. Inj. at 20; *see also, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 795 (2017); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 424 (2006).

Third, the Chestnut Plan consistently reflects the Commission's emphasis on preserving what it determined—on the basis of public comments—to be communities of interest in different districts. Specifically, the Eid declaration identifies communities of interest in every one of Michigan's 13 districts and explains that the Chestnut Plan's "goals" were to preserve them. *See* ECF No. 42-4 PageID 779-785. The plaintiffs counter that the "Commission's handling of cultural and religious communities of interest is the most glaring inconsistency" in its application of this criterion. Pl. Supp. Br. at 2. Specifically, the plaintiffs assert that, though the Commission kept intact a Chaldean community in District 10 and an LGBTQ community in District 11, the Commission split an Orthodox Jewish community into two districts, and did the same to an "Arab Middle Eastern, North African community" in "the southern portion of Dearborn Heights." *Id*. at 3.

To some extent, the plaintiffs have a point. The Commission did split what two commenters described as an Orthodox Jewish community in Oak Park and Southfield between Districts 11 and 12. But keeping some communities intact inevitably means separating others; and the plaintiffs cite only two comments urging the Commission to keep this community intact (one of which urged the Commission to keep all of Oakland County intact, which even the plaintiffs' plan splits into four districts). And even in a comment-driven redistricting process, the Commission's decisions would unavoidably leave some commenters disappointed. Similarly, the Commission did put a part of southern Dearborn Heights into District 13. But the Commission kept the rest of Dearborn Heights and Dearborn intact in District 12, thereby largely heeding the many commenters who urged it to keep intact the Middle Eastern communities in those cities. And the borders of Dearborn Heights itself take the form of a gerrymander of sorts, extending

approximately six miles from north to south and almost five miles east to west, which could make it harder to contain in one district.

Nor did the Commission act inconsistently simply because, as the Commission acknowledges, "each district does not achieve the *same* communities-of-interest objective." Def. Opp. at 22.  The Michigan Constitution afforded the Commission broad discretion to define and identify communities of interest as it saw fit; and in different districts, different types of communities might predominate.  That the Commission thought certain cultural communities predominated in some districts does not mean that it was required to find that every cultural community predominated in every district.  "[R]edistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment."  *Perry v. Perez*, 565 U.S. 388, 393 (2012).  Tradeoffs between keeping some communities intact and splitting others are examples of those kinds of judgments.  The Chestnut Plan reflects those tradeoffs; but the Plan is consistent throughout in its emphasis on communities of interests identified in comments submitted to the Commission.

Fourth, the plaintiffs have not identified any alternative plan that would preserve the "interests" identified by the Commission while "approximat[ing] population equality more closely."  *Karcher*, 462 U.S. at 741.  The plaintiffs' own plan does not preserve those communities of interest or even attempt to; instead it does not apply the community-of-interest criterion at all, apart from the plan's emphasis on preserving county and municipal lines.  And the other four plans voted on by the Commission deviated from "population equality" more than the Chestnut Plan does.  Hence this factor favors deference.  *See Tennant*, 567 U.S. at 765 ("None of the alternative plans came close to vindicating" the State's interests "while achieving a lower variance.").  At oral argument, the plaintiffs did argue for the first time that, given the opportunity, they could tweak

8

the Chestnut Plan to equalize population among districts while retaining its communities of interest. But as counsel for the Commission observed, a districting plan is like a Rubik's Cube: every adjustment requires still more adjustments. If the plaintiffs were to submit a tweaked plan now—as opposed to the altogether redrawn plan that they chose to submit with their motion—the defendants would then be entitled to submit a brief explaining all the other consequences, apart from population equality, wrought by the new plan. For good reasons, we expedited at the plaintiffs' request briefing and argument for their preliminary-injunction motion; we do not have time for another round of briefing and argument now.

2.

The Commission therefore bears only a light burden to show that the Chestnut Plan's 0.14% deviation from perfect equality of population among districts was "necessary to achieve" its goal of maintaining communities of interest. *Karcher*, 462 U.S. at 731. We find that the Commission is very likely to carry that burden in this case. As an initial matter, the Supreme Court has twice accepted the statements of a single legislator as evidence of a State's redistricting goals. *See Tennant*, 567 U.S. at 763–64; *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 801–02 (2017). Eid's declaration is therefore sufficient evidence of the Commission's goals here.

More to the point, the Commission has specifically identified the communities of interest that it sought to maintain in each district: among them, the rural and agricultural northern regions and Native American communities in District 1; the rural farming counties of Barry, Ionia, Montcalm, Gratiot, and Isabella in District 2; the economic I-96 corridor between Muskegon and Grand Rapids in District 3; the people who live in Battle Creek but work or shop in Kalamazoo in District 4; the communities along the southern border of Michigan, with all the unique cultural and economic interests of communities that border another state, in District 5; the white-collar

workforce that resides in District 6; the "tri-county area" of Clinton, Eaton, and Ingham Counties in District 7; the Midland County community of interest in District 8; the rural, agricultural communities in the "thumb" of Michigan in District 9; the Chaldean and other cultural communities in District 10; the "core townships" of Oakland County in District 11; the blue-collar workforce in Livonia, Detroit, Dearborn, and Southfield in District 12; and the "Detroit-centered" communities in District 13.

Eid's declaration recites that public commenters identified every one of these communities of interest. The Commission's record supports Eid's declaration: the Commission has provided hundreds of public comments that identify these same communities of interest. To quantify matters, the plaintiffs dispute the Commission's determinations of communities of interest in eight of Michigan's thirteen congressional districts. For those eight districts, the Commission has produced 351 public comments that the Commission says support its determinations of communities of interests. Having reviewed all of them, we find that 298 of those comments are plainly supportive of the Commission's determinations. The plaintiffs, for their part, have provided citations for 59 comments that they say refute those determinations; having reviewed all of those comments, we find that only 31 of them do. Thus, the overwhelming weight of the record now before us supports the Commission's judgment that the Chestnut Plan's slight deviation from perfect equality of population among districts was "necessary to achieve" the Commission's goal of maintaining its identified communities of interest. *Karcher*, 462 U.S. at 731. The plaintiffs therefore have not shown that their remaining claim has a "likelihood of success on the merits." *Hunter*, 635 F.3d at 233.

B.

"Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020) (cleaned up). We briefly address only one of those factors here. By means of an amendment to the Michigan Constitution, the people of Michigan have exercised their power to prescribe for their state government—rather than having their state government prescribe for them—the manner in which the lines for congressional districts shall be drawn in this State. The public interest supports allowing the upcoming congressional election to proceed with the districting plan drawn in the manner that Michigan's Constitution now prescribes—which is the Chestnut Plan.

The plaintiffs' motion for a preliminary injunction is denied.